**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SUPER COOL PRODUCTS, INC.,**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**BOEHRINGER LABORATORIES, LLC,**<br>**BOEHRINGER LABORATORIES, INC.,**<br>**and GBU, LLC,**<br><br>        **Defendants.** | **CIVIL ACTION NO.  24-5158** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**Rufe, J.**                                                                **September 30, 2025**

Plaintiff Super Cool Products, Inc. ("Super Cool"), brought this action against

Defendants Boehringer Laboratories, LLC, Boehringer Laboratories, Inc. (together,

"Boehringer"), and GBU, LLC, asserting contract claims, intellectual property claims, and other

related claims. Boehringer has counterclaimed, alleging breach of contract and tortious

interference. Before the Court are Super Cool's Motion to Dismiss Boehringer's Amended

Counterclaims and GBU's Motion to Dismiss Super Cool's Amended Complaint. As explained

below, the Court will deny GBU's Motion to Dismiss and grant Super Cool's Motion to Dismiss

Boehringer's Counterclaims.

**I.    PROCEDURAL BACKGROUND**

Super Cool initiated this action by filing a Complaint alleging that Boehringer and GBU

violated non-disclosure agreements and "handshake" agreements with Super Cool by arranging

for GBU to sell "PV8 Sponges" developed by Super Cool directly to Boehringer.[1] Boehringer

and GBU initially filed motions to dismiss Super Cool's Complaint under Federal Rule of Civil

---

[1] Compl. [Doc. No. 1].

Procedure 17(b).[2] Super Cool then filed an Amended Complaint addressing the argument raised with respect to Rule 17(b).[3] GBU has now moved to dismiss the Amended Complaint under Rule 12(b)(6).[4]

In response to the Amended Complaint, Boehringer filed an answer that included affirmative defenses and counterclaims for breach of contract and tortious interference.[5] Super Cool filed a Motion to Dismiss Boehringer's counterclaims;[6] Boehringer then filed an Amended Answer maintaining the same two counterclaims.[7] Super Cool, also invoking Rule 12(b)(6), has moved to dismiss Boehringer's Amended Counterclaims.[8]

After a protracted briefing schedule, both motions to dismiss are fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

"For the purposes of deciding a motion to dismiss under Rule 12(b)(6), claims and counterclaims are treated the same."[9] To survive a motion to dismiss, the pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[10] In evaluating the sufficiency of a pleading, the Court accepts all the well-pleaded factual allegations as true and draws all reasonable inferences in favor of the non-moving party.[11]

---

[2] Boehringer Def.'s Mot. Dismiss Compl. [Doc. No. 15]; GBU Def.'s Mot. Dismiss Compl. at 15 [Doc. No. 17].

[3] Am. Compl. ¶ 2 [Doc. No. 18].

[4] GBU Def.'s Mot. Dismiss Am. Compl. [Doc. No. 21].

[5] Boehringer Def.'s Answer & Countercls. [Doc. No. 23].

[6] Mot. Dismiss Countercls. [Doc. No. 27].

[7] Boehringer Def.'s Am. Answer & Countercls. [Doc. No. 30].

[8] Mot. Dismiss Am. Countercls. [Doc. No. 31].

[9] *See 1600 Walnut Corp. v. Cole Haan Co. Store*, 530 F. Supp. 3d 555, 558 (E.D. Pa. 2021).

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).

[11] *Perrone v. Johnson & Johnson*, 48 F.4th 166, 169 n.1 (3d Cir. 2021).

"A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged."[12] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[13]

The Court evaluates the motions to dismiss sequentially by reference to the factual allegations in the Amended Complaint and the Amended Counterclaims, respectively.

## III.    GBU'S MOTION TO DISMISS THE AMENDED COMPLAINT

### A.    Factual Background

These facts are drawn from the Amended Complaint and are accepted as true for the purposes of GBU's Motion to Dismiss.[14] Super Cool is a corporation organized under the laws of Illinois and registered to do business in Pennsylvania.[15] Super Cool's business is based on designing, manufacturing, marketing, and selling hydrophilic sponges, including polyvinyl and polyurethane sponges, for use in commercial products.[16] Boehringer is a Pennsylvania corporation and LLC that became interested in purchasing a large quantity of polyvinyl sponges for use in an external female catheter that it planned to market to hospitals.[17] GBU is an LLC based in Maine with design and manufacturing capabilities.[18]

In 2019, Super Cool began developing a new set of sponges ("Specialty Sponges") to replace sponges made of an inferior material that had led to inefficient manufacturing, excess

---

[12] *Iqbal*, 556 U.S. at 678.

[13] *Id.*

[14] *See Talley*, 15 F.4th at 286 n.7.

[15] Am. Compl. ¶¶ 1-2 [Doc. No. 18].

[16] Am. Compl. ¶¶ 10, 18 [Doc. No. 18].

[17] Am. Compl. ¶¶ 3, 25, 33 [Doc. No. 18].

[18] Am. Compl. ¶¶ 5, 27 [Doc. No. 18].

contamination, and unnecessary waste.[19] The "PV8 Sponge" was one of the Specialty Sponges that Super Cool eventually designed.[20] In the course of developing the Specialty Sponges, Super Cool invented, created, and perfected unique methods for the developing, engineering, and producing modified alcohol-based polyvinyl and polyurethane sponges.[21] To facilitate the production of the Specialty Sponges, Super Cool also invented, designed, and created the necessary tooling for blow molding, injection molding, casting, and the extruding of material.[22] Concerning the production process, Super Cool gathered information on best practices relating to the use of water filtration systems, the avoidance of bacteria growth, and the safe use of lab samples and polymers.[23] To prevent bacteria from growing on the Specialty Sponges, Super Cool incorporated into the Specialty Sponges, including the PV8 Sponge, an anti-microbial product called Microban™.[24] Microban™ was an essential component of the PV8 Sponge.[25]

Super Cool claims that the methodologies, tooling designs, and best practices concerning the development and production of its Specialty Sponges are trade secrets.[26] Super Cool did not disclose the methodologies, designs, or processes relating to the development and production of the Specialty Sponges with any entity that it perceived could exploit such information without entering first entering into a non-disclosure agreement.[27] It guarded against the disclosure of

---

[19] Am. Compl. ¶¶ 23-25 [Doc. No. 18].

[20] Am. Compl. ¶ 26 [Doc. No. 18].

[21] Am. Compl. ¶ 18 [Doc. No. 18].

[22] Am. Compl. ¶ 19 [Doc. No. 18].

[23] Am. Compl. ¶ 32 [Doc. No. 18].

[24] Am. Compl. ¶¶ 40-42 [Doc. No. 18].

[25] Am. Compl. ¶ 41 [Doc. No. 18].

[26] Am. Compl. ¶¶ 12, 110-16, 137-40 [Doc. No. 18].

[27] Am. Compl. ¶ 21 [Doc. No. 18].

4

these alleged trade secrets by also using multiple facilities in its development process and storing logs and records containing confidential information in secure locations.[28]

Super Cool identified GBU as a company that could manufacture and assist in the design of the Specialty Sponges.[29] Although GBU was initially hesitant to undertake the manufacturing operation that Super Cool proposed due to GBU's unfamiliarity with the polymers involved and its lack of equipment, Super Cool agreed to "finance the process of teaching GBU to make Specialty Sponges."[30] Thereafter, Super Cool and GBU began a business relationship.[31] On April 1, 2019, Super Cool executed a non-disclosure agreement ("NDA") with GBU and a third-party scientific research entity, and on November 15, 2021, Super Cool and GBU executed a second NDA that included a different third party.[32] The NDAs provided that GBU could not use Super Cool's confidential information for any reason except to evaluate a possible business relationship.[33] In reliance on the NDAs, Super Cool revealed to GBU the information that it considers trade secrets, specifically regarding how to make Specialty Sponges.[34]

Around October 2019, Boehringer contacted Super Cool to inquire about ordering large quantities of tubular polyvinyl sponges for use in its external female catheters.[35] To evaluate a the potential business opportunity, Super Cool and Boehringer executed a confidentiality agreement on October 10, 2019 ("Boehringer Confidentiality Agreement"), pursuant to which

---

[28] Am. Compl. ¶ 21 [Doc. No. 18].

[29] Am. Compl. ¶ 27 [Doc. No. 18].

[30] Am. Compl. ¶ 27 [Doc. No. 18].

[31] Am. Compl. ¶ 28 [Doc. No. 18].

[32] Am. Compl. ¶¶ 28-29, Exs. B, C [Doc. No. 18].

[33] Am. Compl. ¶ 30, Exs. B, C [Doc. No. 18].

[34] Am. Compl. ¶¶ 31-32 [Doc. No. 18].

[35] Am. Compl. ¶ 33 [Doc. No. 18].

Super Cool disclosed the information it deemed as trade secrets to Boehringer.[36] Similarly to the NDAs, the Boehringer Confidentiality Agreement precluded Boehringer from using the sensitive information except to evaluate a possible business transaction with Super Cool.[37] Instead of recommending a traditional polyvinyl sponge, Super Cool suggested that Boehringer use one of the Specialty Sponges models that it was developing due to the Specialty Sponges' advantages compared to the inferior material that had been relied upon previously.[38] Specifically, Super Cool raised the possibility that Boehringer could use its new hybrid Specialty Sponge, the "PV8 Sponge," which was the first Specialty Sponge to incorporate Microban$^{TM}$.[39]

In 2020, after opportunities for a visit at Boehringer's corporate facility in Pennsylvania among representatives of Boehringer, GBU, and Super Cool, and for Boehringer to inspect a model of the PV8 Sponge, Boehringer accepted the terms of a verbal agreement proposed by Super Cool ("Boehringer Handshake Agreement").[40] The Boehringer Handshake Agreement included terms for the price of PV8 sponges—varying between $3.35 and $3.95 per unit—and for the payment structure.[41]

At some time in 2020, in connection with its anticipated relationship with Boehringer, Super Cool entered into a verbal agreement with GBU ("GBU Handshake Agreement") that, among other things, Super Cool would purchase PV8 Sponges manufactured by GBU at $2.50 per unit and that GBU would not circumvent Super Cool by soliciting orders directly from

---

[36] Am. Compl. ¶¶ 34-36, Ex. D [Doc. No. 18].

[37] Am. Compl. ¶ 35, Ex. D [Doc. No. 18].

[38] Am. Compl. ¶¶ 36-37 [Doc. No. 18].

[39] Am. Compl. ¶¶ 38-42 [Doc. No. 18].

[40] Am. Compl. ¶¶ 39-44 [Doc. No. 18].

[41] Am. Compl. ¶ 44 [Doc. No. 18]. The Boehringer Handshake Agreement became finalized when, in satisfaction of a condition, Boehringer received feedback from one of its hospital clients that the PV8 Sponge functioned well. Am. Compl. ¶¶ 45-46 [Doc. No. 18].

Boehringer.[42] The GBU Handshake Agreement was confirmed by representatives of GBU and Boehringer via telephone, video conferences, emails, and other actions.[43]

Over the next three years, Super Cool provided more alleged trade secrets to GBU and Boehringer to facilitate the effective manufacturing and sale of PV8 Sponges.[44] In May 2023, Super Cool informed Boehringer of a price increase for the PV8 Sponges that was related to an elevated cost of raw materials.[45] Boehringer was dissatisfied with the price increase and expressed an unwillingness to pay.[46] It tried to negotiate a royalty deal with Super Cool, but the parties did not reach an agreement.[47] In August 2023, Boehringer ceased placing orders with Super Cool.[48] Thereafter, GBU allegedly began selling the sponges that were produced using Super Cool's alleged trade secrets directly to Boehringer.[49] In total, Super Cool delivered over 350,000 units of the GBU-produced PV8 Sponge to Boehringer.[50]

## B.    Discussion

Against GBU, Super Cool alleges breach of contract (Count II) and unjust enrichment in the alternative (Count III), a violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") (Count IV), a violation of the Defend Trade Secrets Act ("DTSA") (Count V), tortious interference with an existing or prospective contractual relationship (Count VI), unfair

---

[42] Am. Compl. ¶¶ 48-49 [Doc. No. 18].

[43] Am. Compl. ¶ 50 [Doc. No. 18].

[44] Am. Compl. ¶¶ 52-54 [Doc. No. 18].

[45] Am. Compl. ¶ 65 [Doc. No. 18].

[46] Am. Compl. ¶ 65 [Doc. No. 18].

[47] Am. Compl. ¶¶ 67-69 [Doc. No. 18].

[48] Am. Compl. ¶ 69 [Doc. No. 18].

[49] Am. Compl. ¶¶ 69-70 [Doc. No. 18].

[50] Am. Compl. ¶ 63 [Doc. No. 18].

competition (Count VIII), civil conspiracy (Count IX), and conversion (Count X).[51] Super Cool

seeks damages and injunctive relief.[52] GBU moves to dismiss Super Cool's Amended Complaint

in its entirety.

> 1.   Choice of Law

As a preliminary matter, the Court must address which state's law applies to the six

common law claims that GBU has moved to dismiss. Because the Court's jurisdiction is based

on diversity, the conflict-of-laws rules of the forum state, Pennsylvania, apply.[53] Pennsylvania

courts will enforce a choice-of-law provision in a contract so long as that clause is valid.[54] Here,

the NDAs executed between Super Cool and GBU provide that the agreements are governed by

Illinois law.[55] Because the parties do not dispute the validity of these clauses, the Court will

apply Illinois law when evaluating Super Cool's Breach of Contract claim under the NDAs.

"Contractual choice of law provisions, however, do not govern tort claims between

contracting parties unless the fair import of the provision embraces all aspects of the legal

relationship."[56] In *Jiffy Lube*, the court deemed a provision stating, "[t]his Agreement shall be

construed, interpreted and enforced in accordance with the laws of the State of Maryland," to be

narrow in scope and thereby inapplicable to tort claims between the parties.[57] The NDA

provisions at issue here provide, "This agreement shall be governed by and construed in

---

[51] Am. Compl. [Doc. No. 18].

[52] Am. Compl. [Doc. No. 18].

[53] *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (Pa. 1941)).

[54] *Cf. Churchill Corp. v. Third Century, Inc.*, 578 A.2d 532, 537 (Pa. Super. Ct. 1990).

[55] Am. Compl. Exs. B, C [Doc. No. 18].

[56] *Jiffy Lube Int'l Inc., v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994).

[57] *Id.*; *see also CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 302 (D.N.J. 2020) (construing a clause referring to "[t]his Agreement" instead of "the parties' relationship" to cover only tort claims such as fraudulent inducement that are "related to the issue of the validity and enforceability of the contract").

8

accordance with the laws of the State of Illinois," and, "[the] Agreement is governed by and will be construed and interpreted in accordance with the laws of the State of Illinois."[58] In light of these clauses' narrow scope and because Super Cool's claims for tortious interference, unfair competition, civil conspiracy, and conversion, are not intertwined with the validity of the NDAs between Super Cool and GBU, the Court will not apply the choice-of-law clause as to those claims. Nor will the Court apply the choice-of-law clause to the unjust enrichment claim, which requires the absence of an express contract,[59] or to the GBU Handshake Agreement.[60]

In the absence of a choice-of-law contract provision, "Pennsylvania applies a 'flexible rule which permits analysis of the policies and interests underlying the particular issue before the court' and directs courts to apply the law of the state with the 'most interest in the problem.'"[61] To discern which state has the greatest interest in the matter, courts consider contacts such as the "place of injury, place of conduct, domicile of the parties, and the place where the relationship between the parties is centered."[62] Courts then "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant issue]."[63] This case involves companies in Illinois, Pennsylvania, and Maine. According to the Amended Complaint, all three of Super Cool's in-person negotiations with Boehringer and GBU occurred

---

[58] Am. Compl. Exs. B, C [Doc. No. 18].

[59] *See Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super Ct. 2006); *C. Szabo Contracting. Inc. v. Lorig Const. Co.*, 19 N.E.3d 638, 645 (Ill. App. 2014).

[60] *See Knox v. Herman Gerel, LLP*, No. 12-2238, 2014 WL 2880277, at *8 n.19 (E.D. Pa. June 24, 2014) (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)).

[61] *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (quoting *Hammersmith*, 480 F.3d at 227); *see also Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964) (abandoning Pennsylvania's prior *lex loci delicti* rule in favor of this interests-based analysis). Although *Griffith* involved a choice-of-law question in the context of tort, its methodology has carried over to contract law. *See Budtel Assocs. v. Cont'l Cas. Co.,* 915 A.2d 640 (Pa. Super. Ct. 2006) ("[T]he spirit and weight of this Commonwealth's precedents mandate we follow the *Griffith* rule in the contract law context.")

[62] *Griffith*, 203 A.3d at 802.

[63] *Specialty Surfaces*, 609 F.3d at 230 (quoting *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir.1987)).

in Pennsylvania.[64] Further, Super Cool is licensed to do business in Pennsylvania, the action was brought in Pennsylvania, and the parties rely predominantly on Pennsylvania case law in their briefing. Accordingly, the Court will apply Pennsylvania law to the common law claims except with respect to the NDAs.

### 2.    Count II: Breach of Contract

In Count II, Super Cool brings against GBU a breach of contract claim, asserting breaches of both nondisclosure agreements and the parties' GBU Handshake Agreement.[65]

### a.    The Non-Disclosure Agreements

For the reasons stated above, the NDAs are governed by Illinois law. In Illinois, to state a claim for breach of contract, a plaintiff must plead: "(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach."[66] Super Cool alleges that it executed two signed NDAs with GBU in which GBU agreed not to use the information that Super Cool disclosed pursuant thereto, except to evaluate a potential business relationship.[67] Super Cool asserts that GBU then used the information to enter into a direct relationship with Super Cool's client, Boehringer.[68] Super Cool claims damages based on its inability to collect on purchase orders by Boehringer after August 2023, leading up to which Super Cool had received payment on several previous orders by Boehringer that year.[69]

---

[64] Am. Compl. ¶¶ 39, 57, 60 [Doc. No. 18].

[65] Am. Compl. ¶¶ 83-94 [Doc. No. 18].

[66] *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 877 (Ill. 2022).

[67] Am. Compl. ¶¶ 28-30, Exs. B, C [Doc. No. 18].

[68] Am. Compl. ¶¶ 69-70, 90 [Doc. No. 18].

[69] Am. Compl. ¶ 71[Doc. No. 18].

Although GBU argues that it did not breach the NDAs because it was not held subject to an exclusive supply relationship, the alleged noncompliance with non-disclosure obligations offers Super Cool a sufficient basis to present a breach of contract claim. Therefore, Super Cool's breach of contract claim under the NDAs will proceed.

b.    *The GBU Handshake Agreement*

With Pennsylvania law applying to the GBU Handshake Agreement, Super Cool must plead "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages."[70] Super Cool alleges that, in the GBU Handshake Agreement, the parties agreed that Super Cool would purchase PV8 sponges at a $2.50 per unit price, with payment due thirty days after delivery and with delivery set to occur within forty-five days after the receipt of a purchase order.[71] Super Cool further asserts that the GBU Handshake Agreement prevented GBU from soliciting orders directly from Boehringer and that the parties confirmed their agreement by "telephone, video conferences, emails, and [their] actions."[72] The alleged facts pertaining to breach and damages align with those in connection to Super Cool's breach of contract claim under the NDAs. Super Cool has accordingly met its pleading requirements.

GBU argues, however, that the Super Cool failed to sufficiently plead that the GBU Handshake Agreement is an enforceable contract because the Amended Complaint does not allege where or how the agreement was formed.[73] GBU separately contends that the GBU Handshake Agreement does not comply with the statute of frauds, as it was not capable of being

---

[70] *DelphX Corp. v. Fondren*, 600 F. Supp. 3d 540, 548 (E.D. Pa. 2022) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

[71] Am. Compl. ¶ 49 [Doc. No. 18].

[72] Am. Compl. ¶ 50 [Doc. No. 18].

[73] GBU Def.'s Mot. Dismiss Am. Compl. at 9 [Doc. No. 21].

performed within one year and involved a sale of goods for greater than $500.[74] Even if the GBU Handshake Agreement were considered a contract, GBU argues it was superseded by written purchase orders that did not include language restricting GBU from selling to Boehringer.[75]

GBU's arguments do not alter the Court's conclusion that Super Cool adequately pleaded a breach of contract claim under the GBU Handshake Agreement. First, although Super Cool could have described the GBU Handshake Agreement's execution with greater specificity as to time, place, and manner, dismissal is not appropriate where the complaint offers "fair notice" to GBU through other details, such as the individuals involved in the agreement and the existence of confirmatory correspondence by phone, video conference, and email.[76] Second, on the facts alleged, the statute of frauds is not clearly applicable because of possible exceptions due to the parties' delivery and acceptance of the PV8 sponges from 2021 and 2023 and because the PV8 Sponges may qualify as unique goods manufactured specifically for Super Cool.[77] Third, the issue of whether subsequent purchase orders displace the GBU Handshake agreement is a question of fact that may be reviewed under a more developed factual record. For the foregoing reasons, Super Cool has plausibly asserted a breach of contract claim under the GBU Handshake Agreement as well as under the NDAs. The Court will deny GBU's Motion to Dismiss as to Count II.

---

[74] GBU Def.'s Mot. Dismiss Am. Compl. at 10-11 [Doc. No. 21].

[75] GBU Def.'s Mot. Dismiss Am. Compl. at 7 [Doc. No. 21].

[76] *See Washington v. Grace*, 353 F. App'x 678, at * 1 (E.D. Pa. Nov. 25, 2009) (quoting *Twombly*, 550 U.S. at 555).

[77] *See* Pa. Cons. Stat. Ann. § 2201(c)(1), (3).

3.    <u>Count III: Unjust Enrichment</u>

Provided that it cannot recover under a breach of contract theory, Super Cool brings a claim for unjust enrichment.[78] In Pennsylvania, to survive a motion to dismiss a claim for unjust enrichment, a plaintiff must show "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[79]

GBU argues that the unjust enrichment claim should be dismissed because Super Cool separately pleads that the parties' relationship was governed by an express contract.[80] Although GBU is correct that unjust enrichment is noncognizable in the event of a written or express contract,[81] this inconsistency among Super Cool's claims does not automatically require a dismissal. In general, Rule 8(d) permits a party to make claims that are inconsistent with one another at the pleading stage.[82] An exception to this rule applies when breach of contract and unjust enrichment are pleaded together. Namely, a plaintiff "may plead [unjust enrichment] in the alternative [only] when there is a dispute about the existence or validity of a contract."[83]

In its Amended Complaint, Super Cool asserts that it and GBU entered into three express contracts: the first NDA in 2019, the second NDA in 2021, and the GBU Handshake Agreement

---

[78] Am. Compl. ¶¶ 95-107 [Doc. No. 18].

[79] *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012); *see also Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 531 n.7 (Pa. 2010)

[80] GBU Def.'s Mot. Dismiss Am. Compl. at 15 [Doc. No. 21].

[81] *See Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006).

[82] Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.")

[83] *Buccigrossi v. Thomas Jefferson Univ.*, No. 21-cv-221-JMY, 2022 WL 1093127, at *4 (E.D. Pa. Apr. 12, 2022) (citing Pennsylvania cases); *see also Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 n.8 (3d Cir. 2014) (affirming the dismissal of an unjust enrichment claim where the "existence and validity" of the parties' contractual relationship was not challenged).

in 2020.[84] GBU argues that the first NDA ceased to be in effect at the execution of the second NDA and that GBU Handshake Agreement is not an enforceable contract.[85] Therefore, because the parties dispute the validity of two of the three alleged contracts, Super Cool is not precluded from pleading unjust enrichment at this stage.

Turning to the elements of an unjust enrichment claim, Super Cool asserts that GBU became aware of the alleged trade secrets used to develop Specialty Sponges through the parties' NDAs, through Super Cool's financing of GBU's manufacturing process, and through Super Cool's oversight throughout the manufacturing process.[86] Super Cool alleges that GBU continues to rely on and benefit from Super Cool's Specialty Sponges trade secrets through GBU and Boehringer's business relationship.[87] Meanwhile, Super Cool claims that it has not received any pecuniary gain from the new relationship between GBU and Boehringer.[88] Hence, provided a contract did not exist between the parties, Super Cool has pleaded facts that, supported by reasonable inferences, lead to the plausible conclusion that GBU was unjustly enriched by its obtaining of Super Cool's alleged trade secrets. GBU's Motion to Dismiss Count III against GBU will be denied.

---

[84] Am. Compl. ¶¶ 28-29, 48-50 [Doc. No. 18].

[85] GBU Def.'s Mot. Dismiss Am. Compl. at 7, 9 [Doc. No. 21].

[86] As part of this oversight, Super Cool alleges that it "[a]dvised GBU about facility upgrades on its unfinished building and equipment," "[a]dvised GBU on plastics, Teflon, rubber, glass, and other materials to make the original molds to cast the sponge," and "[t]ested hot-wire, ultra-sonic, and other types of cutting for sponge production." Am. Compl. ¶ 52 [Doc. No. 18].

[87] Am. Compl. ¶¶ 69-71, 100 [Doc. No. 18].

[88] Am. Compl. ¶¶ 71, 102 [Doc. No. 18].

4.    Counts IV and V: Violations of the PUTSA and DTSA

Counts 4 and 5 allege the misappropriation of trade secrets under the PUTSA and the DTSA.[89] The requirements of each statute are substantially similar. Under the DTSA, "misappropriation" is defined to apply to a number of different actions.[90] As it concerns this case, misappropriation includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret."[91] Similarly to a DTSA claim, a PUTSA claim requires a plaintiff to show that (1) the plaintiff owned a trade secret, (2) the defendant acquired that trade secret in circumstances giving rise to a duty to protect its confidentiality, and (3) the defendant disclosed or used the trade secret without the plaintiff's consent.[92] The "trade secrets" definitions in the PUTSA and DTSA differ somewhat but "[b]oth define a trade secret as information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use."[93]

---

[89] Am. Compl. ¶¶ 108-65 [Doc. No. 18].

[90] 18 U.S.C. § 1839(5).

[91] *Id.*; *see also Teva Pharmaceuticals USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018). "In order to show 'use,' a plaintiff must show that the defendant took 'advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as assist[ing] or accelerat[ing] research or development.'" *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, No. 20-2888, 2021 WL 4745230, at *3 (E.D. Pa. Oct. 12, 2021) (quoting *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021)).

[92] 12 Pa. Cons. Stat. Ann. § 5302.

[93] *Teva*, 291 F. Supp. 3d at 675 (citing 18 U.S.C. § 1839(3)).

GBU asserts that these claims should be dismissed because the Amended Complaint did not adequately define the alleged trade secrets.[94] However, given the inherently sensitive nature of trade secrets, extensive descriptions of the purported trade secret are not necessary at the pleading stage but rather appropriate at the time of fact-intensive proceedings, such as an injunction hearing.[95]

The Amended Complaint alleges that Super Cool kept its methodologies, designs, tooling development, and best practices secret by executing NDAs, keeping secure logs, and performing work at different facilities.[96] Super Cool further alleges that the methodologies used to develop and perfect the Specialty Sponges and PV8 Sponge derived value as compared to the previous inferior material because of the PV8 Sponge's production efficiency and high levels of satisfaction from Boehringer's buyers.[97] Finally, the Amended Complaint alleges that before Boehringer and GBU entered into revenue-generating business relationships with Super Cool and with each other, they needed extensive time to learn about the methodologies used in the production of the PV8 Sponge and to obtain assurances that the methods employed would be practicable.[98] Super Cool therefore adequately pleaded that it possessed a trade secret. Super Cool's Amended Complaint also meets the standards for alleging misappropriation, as it asserts that GBU used the trade secrets to sell directly to Boehringer for financial gain, without

---

[94] GBU Def.'s Mot. Dismiss Am. Compl. At 5 [Doc. No. 21].

[95] *See Alpha Pro Tech., Inc., v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 435-36 (E.D Pa. 2013); *Mallet & Co. v. Lacayo*, 16 F.4th 364, 382 (3d Cir. 2021).

[96] Am. Compl. ¶ 21 [Doc. No. 18].

[97] Am. Compl. ¶¶ 23-25, 46 [Doc. No. 18].

[98] Am. Compl. ¶¶ 28-32, 39-43 [Doc. No. 18].

obtaining consent from Super Cool.[99] Thus, Super Cool has plausibly alleged misappropriation of trade secrets under the DTSA and PUTSA.

     5.    <u>Count VI: Tortious Interference</u>

In Count VI, Super Cool sues GBU for tortious interference with an existing and prospective contractual relationship.[100] As set forth in the Amended Complaint, the tortious interference claim arises from Super Cool's alleged contractual relationship with Boehringer. Under Pennsylvania law, the elements of this claim are:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.[101]

GBU first argues that PUTSA preempts all state law tort claims—including the tortious interference claim—that originated from the same alleged facts that gave rise to the misappropriation claim in Count IV and Count V.[102] GBU is correct that "PUTSA preempts 'conflicting' state tort law claims that are 'based on the same conduct that is said to constitute a misappropriation of trade secrets.'"[103] However, "[i]t is premature to determine whether the tort

---

[99] Am. Compl. ¶ 172 [Doc. No. 18].

[100] Am. Compl. ¶¶ 166-81 [Doc. No. 18].

[101] *Bazelon v. Pace Gallery of New York, Inc.*, No. 24-1686, 2025 WL 388820, at *6 (E.D. Pa. Feb. 4, 2025) (quoting *Acumed LLC v. Adv. Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009)).

[102] GBU Def.'s Mot. Dismiss Am. Compl. at 13 [Doc. No. 21].

[103] *Teva*, 291 F. Supp. 3d at 676 (quoting *Alpha Pro Tech*, 984 F. Supp. 2d at 447); *see* 12 Pa. Cons. Stat. Ann. § 5308(a).

claims conflict with PUTSA because [Super Cool] may pursue alternative theories of liability at this stage."[104]

Super Cool identifies two theories for a tortious interference claim: either GBU (1) unlawfully interfered with contracts in effect between Super Cool and Boehringer or (2) unlawfully interfered with a future contractual relationship between Super Cool and Boehringer.[105] As to the first scenario, Super Cool pleads that it entered into both the Boehringer Confidentiality Agreement addressing non-disclosure obligations and the Boehringer Handshake Agreement setting terms for price, quantity, and delivery of the PV8 Sponge.[106] Super Cool further pleads that a representative of GBU was aware of Boehringer's attempts to cut Super Cool out of the parties' relationship before GBU began selling the PV8 Sponge to Boehringer.[107] These allegations support an inference that GBU intended to cut Super Cool out of the parties' relationship when it sold to Boehringer. Viewed together, Super Cool's allegations also support the reasonable inference that GBU's efforts to supply PV8 Sponges directly to Boehringer harmed Super Cool by creating a financial incentive for Boehringer to bypass Super Cool's position in the supply chain. Super Cool's tortious interference claim based on an existing contract will therefore proceed.

By contrast, Super Cool has not pleaded sufficient facts to enable a reasonable inference of a probable future contractual relationship between Boehringer and Super Cool. As the Amended Complaint concedes, Boehringer was dissatisfied by Super Cool's imposition of a price increase on PV8 Sponges and expressed that it was unwilling to pay the additional

---

[104] *Id.*

[105] Am. Compl. ¶ 171 [Doc. No. 18].

[106] Am. Compl. ¶¶ 35, 44, 171, 175 [Doc. No. 18].

[107] Am. Compl. ¶ 66 [Doc. No. 18].

amount.[108] Further, the Amended Complaint states that, in the time leading up to Boehringer and

Super Cool's final completed purchase order in August 2023, the parties' negotiations toward a

written exclusive supply agreement were unsuccessful.[109]

### 6.    Count VIII: Unfair Competition

In Count VIII, Super Cool brings a common law unfair competition claim against

GBU.[110] Pennsylvania case law on common law unfair competition is sparse, but there is

sufficient legal foundation for it to be a cognizable theory of recovery.[111] "The Pennsylvania

common law tort of unfair competition is coextensive with the definition set forth in the

Restatement (Third) of Unfair Competition."[112] The Restatement provides:

> One who causes harm to the commercial relations of another by engaging in a
> business or trade is not subject to liability to the other for such harm unless:
>
> (a) the harm results from . . .
>
> . . . other acts or practices of the actor determined to be actionable as an
> unfair method of competition, taking into account the nature of the
> conduct and its likely effect on both the person seeking relief and the
> public. . . .[113]

---

[108] Am. Compl. ¶¶ 65, 67 [Doc. No. 18].

[109] Am. Compl. ¶¶ 56, 61 [Doc. No. 18].

[110] Am. Compl. ¶¶ 200-13 [Doc. No. 18].

[111] *See ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003) ("Although no
Pennsylvania appellate court has formally recognized the common law tort of unfair competition, several lower state
and federal courts have recognized the existence of a cause of action for unfair competition under some
circumstances."), *judgment amended* 268 F. Supp. 2d 448 (E.D. Pa. 2003); *Yeager's Fuel, Inc. v. Pa. Power & Light
Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997) (stating that a common law unfair competition claim is cognizable under
the Restatement (Third) of Unfair Competition); *Lakeview Ambulance & Med. Servs, Inc. v. Gold Cross Ambulance
& Med. Servs., Inc.*, No. 1994-2166, 1995 WL 842000, at *2 (Pa. Com. Pl. Oct. 18, 1995).

[112] *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 246 (E.D. Pa. 2017) (granting a motion to
dismiss an unfair competition claim as to one defendant but not the other).

[113] Restatement (Third) of Unfair Competition § 1 (1995).

A comment to this section explains that practices deemed to be "an unfair method of competition" include those that are "otherwise tortious with respect to the injured party."[114] Because Super Cool has stated a claim for relief as to tortious interference, it follows that it has stated a claim for unfair competition. Hence, Super Cool's unfair competition claim will survive GBU's Motion to Dismiss.

7.    Count IX: Civil Conspiracy

To overcome a motion to dismiss on its civil conspiracy claim, a plaintiff must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."[115] The Amended Complaint alleges that, after a four-year cooperative relationship between the parties, GBU and Boehringer began a direct sales relationship, thereby violating legal obligations in contract, tort, and under the DTSA and PUTSA.[116] Super Cool alleges that GBU and Boehringer did not merely perform an overt act toward a new business relationship but in fact commenced their business relationship by initiating sales.[117] The Amended Complaint also alleges—plausibly—that Super Cool suffered damages in excess of $75,000 from GBU's decision to exploit Super Cool's alleged trade secrets in service of a direct relationship with Boehringer.[118]

GBU argues Super Cool's civil conspiracy cause of action fails to state a claim, as Super Cool did not plead sufficient facts to allege that GBU and Boehringer began a direct business

---

[114] *Id.* at § 1 cmt. g.

[115] *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)).

[116] Am. Compl ¶¶ 28, 34, 52, 69-71 [Doc. No. 18].

[117] Am. Compl ¶¶ 69-71 [Doc. No. 18].

[118] Am. Compl ¶¶ 212-13 [Doc. No. 18].

relationship "solely to injure" Super Cool.[119] GBU relies on *Thompson Coal Co. v. Pike Coal Co.*, in which the Pennsylvania Supreme Court affirmed an order entering summary judgment for the defendant on a civil conspiracy claim because the facts suggested that the defendant acted "solely to advance the legitimate business interests of his client and to advance his own interests" rather than to injure the plaintiffs.[120]

For two interrelated reasons, the Court disagrees that *Thompson Coal* applies to this case. First, *Thompson Coal* was decided on a summary judgment record, while the parties here have not initiated discovery, which may reveal significant facts about GBU and Boehringer's intentions when they began their business venture. Second, at the pleading stage, "the fact that a defendant may benefit economically from improper actions undertaken as part of a conspiracy does not necessarily preclude a finding that the defendant acted with malice" if the complaint sufficiently alleges malice on the part of the defendants.[121] For example, an allegation that the defendants "conspired to knowingly and intentionally misappropriate trade secrets" protected under NDAs with the plaintiff in order to "harm [the plaintiff's] competitive advantage" may support an inference that the defendants "intended to harm [the plaintiff] without legal justification."[122] Here, where Super Cool presents a similar allegation—that "GBU and [Boehringer] . . . aided and abetted each other to engage in a concerted action for an illegal, unlawful and/or inappropriate purpose, namely, to deprive [Super Cool] of its rights with respect

---

[119] GBU Def.'s Mot. Dismiss Am. Compl. at 13 [Doc. No. 21].

[120] *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472-73 (Pa. 1979) ("Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy.")

[121] *PDC Machs. Inc. v. Nel Hydrogen A/S*, No. 17-5399, 2018 WL 3008531, at *5 (E.D. Pa. June 15, 2018); *see also Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212-13 (Pa. Super. Ct. 2003) (concluding that an agreement between a radio station manager and his future employer that the employer would hire the manager's colleagues in violation of non-compete agreements was made with intent to injure when it harmed the sales performance of the already short-handed radio station).

[122] *PDC Machs.*, 2018 WL 3008531, at *5.

to exclusive use of the Specialty Sponges Trade Secrets, to tortiously interfere with [Super Cool's] current and prospective business"—the Court concludes that Super Cool has met its pleading requirement with regard to GBU's intent to injure.[123] The Court will deny GBU's Motion to Dismiss as to the Civil Conspiracy claim.

  8. <u>Count X: Conversion</u>

  Under Pennsylvania law, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."[124] In the Amended Complaint, Super Cool asserts that GBU violated the NDAs and GBU Handshake Agreement, leading it to exploit Super Cool's alleged trade secrets for financial gain.[125] This allegation tends to support an inference that a deprivation occurred without Super Cool's consent. However, in its Motion to Dismiss, GBU raises the other relevant issue to the validity of a conversion claim—whether confidential business information or trade secrets qualify as a "chattel."[126]

  A number of federal cases in this District have accepted that a conversion claim may be brought where a party is unlawfully deprived of trade secrets or other confidential business information.[127] The Pennsylvania Superior Court clarified the contours of conversion of intangible property in Pennsylvania, holding that conversion claims were available "only to intangible rights to property that are typically merged in or identified with a particular

---

[123] Am. Compl. ¶ 207 [Doc. No. 18].

[124] *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (quoting *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964)).

[125] Am. Compl. ¶¶ 69-71 [Doc. No. 18].

[126] GBU Def.'s Mot. Dismiss Am. Compl. at 14 [Doc. No. 21].

[127] *See Am. Hearing Aid Assocs., Inc. v. GN Resound N.A.*, 309 F.Supp.2d 694, 705 (E.D. Pa. 2004); *PNC Mortg. v. Superior Mortg. Corp.*, No. 09-5084, 2012 WL 628000, at *25-26 (E.D. Pa. 2012).

document."[128] Applying this rule in *WhiteSand*, the Superior Court vacated the dismissal of a conversion claim alleging the intentional erasure of business information from a computer.[129] It reasoned that the erased information "may ultimately be considered tangible and, therefore, properly the subject of a conversion claim."[130] Because Super Cool's alleged trade secrets involve the creation of "proprietary tooling," stored "logs and records," and other concrete information that may be digitally accessible in files and documents,[131] the Court will deny GBU's Motion to Dismiss Count X.

## IV. SUPER COOL'S MOTION TO DISMISS BOEHRINGER'S AMENDED COUNTERCLAIMS

In counterclaims against Super Cool, Boehringer alleges breach of contract (Count I) and tortious interference with contractual relations (Count II).[132] Super Cool has moved to dismiss both counterclaims.[133]

When evaluating the validity of a defendant's counterclaims in the context of a motion to dismiss, the Court must "accept as true the well-pleaded facts of the counterclaim[s] and disregard legal conclusions."[134] The Court must then determine whether the these factual allegations, combined with "all reasonable inferences in favor of the [defendant] . . . 'state a claim to relief that is plausible on its face.'"[135]

---

[128] *WhiteSand Rsch., LLC v. Sehn*, No. 1123 WDA 2017, 2018 WL 2728847, at *9-10 (Pa. Super. Ct. June 7, 2018).

[129] *Id.* at *10.

[130] *Id.*

[131] Am. Compl. ¶¶ 20-21 [Doc. No. 18].

[132] Boehringer Def.'s Am. Answer & Countercls. at 52, 55 [Doc. No. 30].

[133] Mot. Dismiss Am. Countercls. [Doc. No. 30].

[134] *Patel v. Dhaduk*, 839 F. App'x 715, 720 (3d Cir. 2020).

[135] *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020) (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)); *See 1600 Walnut Corp.* 530 F. Supp. 3d at 558 (stating that motions to dismiss claims and counterclaims are evaluated identically).

### A.    Factual Background

The following background is drawn from the factual allegations accompanying Boehringer's counterclaims, which are accepted as true for purposes of Super Cool's Motion to Dismiss. On or about October 11, 2019, Boehringer and Super Cool executed the Boehringer Confidentiality Agreement that is also mentioned in the Amended Complaint.[136] The agreement provides for Super Cool to disclose to Boehringer technical business information, which Boehringer could neither transmit to third parties nor utilize, except to evaluate a possible business relationship with Super Cool.[137] Under Paragraph 1(d) of the Boehringer Confidentiality Agreement, Super Cool agreed that if it deemed any technical business information confidential, it would mark the information as "Confidential" and notify Boehringer within thirty days of when the information was disclosed.[138] Any equipment shared between the parties pursuant to the agreement would automatically be designated "Confidential."[139] Boehringer relied upon Super Cool to comply with its obligation to designate information as "Confidential" under the agreement.[140] In the event of a legal dispute, the agreement stated, "the prevailing party shall be entitled to an award of all costs, fees and expenses including reasonable attorney fees."[141]

Following the execution of the Boehringer Confidentiality Agreement, Super Cool designated solely two documents as "Confidential" pursuant to Paragraph 1(d). Those documents were a Progress Report, dated March 19, 2020, and a document titled "Antimicrobial Selection

---

[136] Boehringer Def.'s Am. Answer & Countercls. ¶ 231 [Doc. No. 30]. The Amended Complaint states that the agreement was executed on October 10. Am. Compl. ¶ 34 [Doc. No. 18].

[137] Boehringer Def.'s Am. Answer & Countercls. Ex. A [Doc. No. 30].

[138] Boehringer Def.'s Am. Answer & Countercls. ¶ 231, Ex. A [Doc. No. 30].

[139] Boehringer Def.'s Am. Answer & Countercls. ¶ 232, Ex. A [Doc. No. 30].

[140] Boehringer Def.'s Am. Answer & Countercls. ¶ 243 [Doc. No. 30].

[141] Boehringer Def.'s Am. Answer & Countercls. ¶ 236, Ex. A [Doc. No. 30].

for Polyurethane PV8."[142] Super Cool did not designate as "Confidential" the methods, tooling, or best practices that it classified as "Specialty Sponges Trade Secrets" in the Amended Complaint.[143] Boehringer therefore asserts that Super Cool breached the Boehringer Confidentiality Agreement by failing to notify Boehringer that the alleged trade secrets it was sharing were "Confidential" and by thereafter suing Boehringer for disclosing those alleged trade secrets.[144]

Shortly before Super Cool filed this lawsuit, Boehringer and GBU executed a number of contracts.[145] In these contracts, GBU had agreed to sell sponges that were different from the PV8 Sponge to Boehringer a specific unit price.[146] Boehringer expected that it would enter into future sponge contracts with GBU at the same unit price.[147] Super Cool then elected to file this lawsuit to allegedly harm the business relationship between Boehringer and GBU and to reinstate the prior arrangement whereby Super Cool, not having its own manufacturing capabilities, would sell GBU-manufactured sponges to Boehringer at a marked-up price.[148] As a result of the lawsuit, GBU informed Boehringer that it would need to charge Boehringer a higher unit price on sponge contracts unless Boehringer indemnified GBU as to Super Cool's claims.[149] Boehringer declined to indemnify GBU and thereafter began paying GBU a higher unit price on

---

[142] Boehringer Def.'s Am. Answer & Countercls. ¶ 237 [Doc. No. 30].

[143] Boehringer Def.'s Am. Answer & Countercls. ¶ 241. Boehringer alleges that, eventually, it began to place purchase orders to buy sponge products from Super Cool but that the two parties never entered into a written, exclusive supply agreement despite attempting to do so multiple times. Boehringer Def.'s Am. Answer & Countercls. ¶¶ 252, 257-58 [Doc. No. 30].

[144] Boehringer Def.'s Am. Answer & Countercls. ¶ 244 [Doc. No. 30].

[145] Boehringer Def.'s Am. Answer & Countercls. ¶ 248 [Doc. No. 30].

[146] Boehringer Def.'s Am. Answer & Countercls. ¶ 248 [Doc. No. 30]

[147] Boehringer Def.'s Am. Answer & Countercls. ¶¶ 248-49 [Doc. No. 30].

[148] Boehringer Def.'s Am. Answer & Countercls. ¶¶ 251-52, 256 [Doc. No. 30].

[149] Boehringer Def.'s Am. Answer & Countercls. ¶ 249 [Doc. No. 30].

sponge contracts.[150] Accordingly, Boehringer claims that it suffered damages from Super Cool's filing of the lawsuit.

**B.    Discussion**

1.    Count I: Breach of Contract

Boehringer's first counterclaim against Super Cool is for breach of contract. The Boehringer Confidentiality Agreement contains a choice-of-law clause stating, "This Agreement shall be governed for all purposes by the laws of the Commonwealth of Pennsylvania."[151] The parties have not disputed this clause's validity, so the Court will apply Pennsylvania law to Boehringer's breach of contract claim.

To plead breach of contract under Pennsylvania law, a plaintiff must assert facts showing "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."[152] Boehringer alleges that a contract formed when it and Super Cool agreed to the terms of the Boehringer Confidentiality Agreement.[153] It alleges that it suffered damages after Super Cool breached that contract by failing to notify Boehringer under Paragraph 1(d) that certain portions of Super Cool's shared business information were "Confidential" and by then suing Boehringer for disclosing that shared information, which Super Cool now alleges to be trade secrets.[154] Boehringer alleges damages in connection with that breach.[155]

Super Cool contends that Boehringer's counterclaim does not state a claim for relief because, among other reasons, Boehringer has not asserted that it suffered an injury from the

[150] Boehringer Def.'s Am. Answer & Countercls. ¶ 250 [Doc. No. 30].

[151] Boehringer Def.'s Am. Answer & Countercls. Ex. A [Doc. No. 30].

[152] *DelphX*, 600 F. Supp. 3d at 548 (quoting *Meyer, Darragh, Buckler, Bebenek & Eck*, 137 A.3d at 1258).

[153] Boehringer Def.'s Am. Answer & Countercls. ¶¶ 230, 242 [Doc. No. 30].

[154] Boehringer Def.'s Am. Answer & Countercls. ¶¶ 242-45 [Doc. No. 30].

[155] Boehringer Def.'s Am. Answer & Countercls. ¶ 245 [Doc. No. 30].

breach of a contractual duty.[156] The Court agrees with Super Cool. "[T]he interpretation of the

terms of a contract is a question of law."[157] Accepting Boehringer's factual allegations as true,

neither Super Cool's lawsuit nor its failure to notify Boehringer that the alleged trade secrets

were "Confidential" is a basis for a cognizable breach of contract claim.

Concerning the lawsuit, Boehringer does not allege any facts suggesting that the

Boehringer Confidentiality Agreement precluded either party from seeking relief pursuant to its

terms. Indeed, the agreement contemplates the possibility of legal action through Paragraph 6,

which provides for the awarding the prevailing party "all costs, fees and expenses, including

reasonable attorney's fees."[158] As to the allegation that Super Cool failed to provide notice, the

Boehringer Confidentiality Agreement did contain language requiring Super Cool to notify

Boehringer of information it deemed "Confidential" and to mark that material as such. Paragraph

1 provides:

> The Disclosing Party agrees to mark all written Information deemed confidential
> and proprietary as "Confidential" and to provide a written representation of any
> orally or visually presented Information, properly marked as being "Confidential"
> within thirty (30) days of disclosure of such Information to the other party. It is
> further agreed to by the parties that any equipment provided by either of the
> Parties pursuant to this Agreement, including instructions or other materials
> provided therewith, shall be deemed to be Information and to have been marked
> "Confidential" and shall be maintained in confidence and not used in any manner
> other than solely to evaluate the Possible Transaction.[159]

Although Boehringer sufficiently pleaded that Super Cool was in breach of this paragraph

insofar as it failed to provide notice that many of its methodologies, products, documents, and

data were "Confidential," Boehringer has not alleged damages that were incurred because of this

---

[156] Pl.'s Mot. Dismiss Countercls. at 7 [Doc. No. 31].

[157] *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009).

[158] Boehringer Def.'s Am. Answer & Countercls. ¶ 236, Ex. A. [Doc. No. 30]

[159] Boehringer Def.'s Am. Answer & Countercls. ¶ 236, Ex. A. [Doc. No. 30]

noncompliance; the damages are instead asserted with respect to the bringing of the lawsuit.[160]

Of note, Super Cool's alleged noncompliance with Paragraph 1 did not impede Boehringer from

deriving the Boehringer Confidentiality Agreement's central benefit: access to information that

would be instructive in determining whether to pursue a business relationship with Super Cool.

Because Boehringer has not sufficiently pleaded its breach of contract claim, the Court

will grant Super Cool's Motion to Dismiss as to Count I.

### 2.    Count II: Tortious Interference

Although the choice-of-law clause in the Boehringer Confidentiality Agreement is not

broad enough to extend to Boehringer's tort claims against Super Cool, the Court will apply

Pennsylvania law because, as discussed above, Pennsylvania has more substantial contacts with

the parties and their business relationship than Illinois or Maine. To plead a tortious interference

claim in Pennsylvania, a plaintiff must allege sufficient facts to meet the following elements:

> (1) the existence of a contractual or prospective contractual or economic
> relationship between the plaintiff and a third party; (2) purposeful action by the
> defendant, specifically intended to harm an existing relationship or intended to
> prevent a prospective relation from occurring; (3) the absence of privilege or
> justification on the part of the defendant; (4) legal damage to the plaintiff as a
> result of the defendant's conduct; and (5) for prospective contracts, a reasonable
> likelihood that the relationship would have occurred but for the defendant's
> interference.[161]

Boehringer asserts that Super Cool intentionally filed this lawsuit to harm Boehringer's

prospective contractual relationship with GBU and that Boehringer suffered legal damage in the

form of disadvantageous pricing in its renegotiated contracts with GBU.[162] It additionally alleges

that Super Cool did not act pursuant to a privilege or justification when it filed the lawsuit.[163]

---

[160] Boehringer Def.'s Am. Answer & Countercls. ¶ 244 [Doc. No. 30].

[161] *Bazelon*, 2025 WL 388820, at *6 (E.D. Pa. Feb. 4, 2025) (quoting *Acumed*, 561 F.3d at 212).

[162] Boehringer Def.'s Am. Answer & Countercls. ¶¶ 249, 253 262 [Doc. No. 30].

[163] Boehringer Def.'s Am. Answer & Countercls. ¶ 254. [Doc. No. 30].

The Court is not persuaded that Boehringer adequately pleaded an absence of privilege. In Pennsylvania, judicial privilege "extends to 'communications which are issued in the regular course of judicial proceedings, and which are pertinent and material to the redress or relief sought.'"[164] Judicial privilege also applies to "pleadings and even less formal communications such as preliminary conferences between counsel," thereby serving to "guarantee[] access to the courts and permit[] the free articulation and resolution of legal claims."[165] Litigants, witnesses, judges, and lawyers originally relied on judicial privilege to obtain insulation from deposition lawsuits that might otherwise have arisen from statements at made at court proceedings.[166] But the doctrine has now been extended to apply to other torts and to contract lawsuits.[167] For instance, in *AdvantageCare*, a case brought in the Western District of Pennsylvania, a defendant brought against the plaintiff a counterclaim for tortious interference alleging that the plaintiff interfered with the defendant's contractual relations by initiating "the litigation itself."[168] The court held that judicial privilege "is a complete bar" to the defendant's counterclaim.[169]

Similarly, Boehringer's counterclaim for tortious interference is also predicated upon Super Cool's filing of the present lawsuit. As in *AdvantageCare*, and consistent with the objective of guaranteeing unimpeded access to courts, Super Cool's initiation of this action through its Complaint and Amended Complaint amounted to judicially privileged conduct that precludes Boehringer from stating a valid tortious interference claim.

[164] *Gen. Refractories*, 337 F.3d at 311 (quoting *Post v. Mendel*, 507 A.2d 351, 353 (Pa. 1986)).

[165] *Handy v. Del. River Surgical Suites, LLC*, 2023 WL 11884819, at *1 n.1 (E.D. Pa. Mar. 24, 2023).

[166] *Panitz v. Behrend*, 632 A.2d 562, 564 (Pa. Super. Ct. 1993).

[167] *See id.* ("[T]he origin of the privilege in defamation and the extension to 'all tort actions'" . . . does not limit the application in contract cases."); *AdvantageCare Rehab., LLC v. Wiley Mission*, No. 24-229, 2024 WL 5158465, at *2 (W.D. Pa. Dec. 18, 2024).

[168] *AdvantageCare Rehab. v. Wiley Mission*, No. 24-229, 2024 WL 5158465, at *2 (W.D. Pa. Dec. 18, 2024).

[169] *Id.*

If, as Boehringer alleges, Super Cool's lawsuit is without merit and merely an attempt to undermine the contractual relationship of its former business partners, relief would lie in a separate action for wrongful use of civil proceedings, provided that this case terminates in favor of Boehringer.[170] However, at this early stage, the Court will not "permit an 'end-run' around the policy and ripeness considerations mandating that an underlying action terminate before a wrongful use of civil proceedings ensues."[171] The Court will grant Super Cool's Motion to Dismiss as to Count II.

## V.    CONCLUSION

For the reasons stated above, GBU's Motion to Dismiss the Amended Complaint is denied and Super Cool's Motion to Dismiss Boehringer's Amended Counterclaims is granted. An order will be entered.

---

[170] *See* 42 Pa. Cons. Stat. Ann. § 8351(a)(2).

[171] *Univ. Patents, Inc. v. Kligman*, No. 89-3525, 1990 WL 29668, at * 1 (E.D. Pa. Mar. 16, 1990).